We will hear argument this morning in Case 24-781, First Choice Women's Resource Centers v. Platkin. Ms. Hawley. Thank you, Mr. Chief Justice, and may it please the Court. This Court has long safeguarded the right of association by protecting the membership and donor lists of nonprofit organizations like First Choice. Yet the Attorney General of New Jersey issued a sweeping subpoena commanding, on pain of contempt, that First Choice produce donor names, addresses, and phone numbers so his office could contact and question them. That violates the right of association. Yet the lower courts held that First Choice must litigate its First Amendment claims in state court. That violates this Court's decision in Nick, contradicts the Court's virtually unflagging obligation to decide cases within their jurisdiction, and runs contrary to Section 1983. Even the Attorney General now agrees as much. His newest rationale for evading review, questioning First Choice's chilling injury, fails for two reasons. First, First Choice's associational interests were harmed the moment it received a coercive subpoena demanding donor names on pain of contempt. This is true irrespective of whether the subpoena is non-self-executing, for even an unenforceable threat may chill First Amendment freedoms. Second, the Attorney General does not dispute that First Choice faces a credible threat of enforcement. And there's no question that First Choice's First Amendment interests are arguably burdened by the subpoena. This Court's cases require no more. The Attorney General's proposed subpoena exception from ordinary Article III rules would mean that the NAACP could have received a hostile subpoena from an Attorney General, and federal court review would not have been available until a state court ordered production. But then, younger abstention and res judicata would almost certainly slam the federal courthouse doors shut. This Court should reverse and hold that this subpoena violates the First Amendment and satisfies Article III. Your argument seems to be based on the mere reception of the subpoena. So what did that cause you to do? Sure. So under Article III, we can have both a present and a future imminent harm, Your Honor. But what did you have to do upon reception of this subpoena? So the subpoena commands First Choice to do several things. It commands it to produce 28 different categories of documents, including every solicitation, email, and text message it sent to its donors. It commands it produce donor names, addresses, phone numbers, as well as places of employment. It imposes a litigation hold, Your Honor. And it also chilled First Choice and its donors' First Amendment rights. If you look at the complaint, the complaint alleges both a present as well as a future looking chill. The complaint alleges the coercive nature of the subpoena. This is a Petition Appendix 127 through 129. It details that the subpoena demands on pain of contempt these donor names. Petition Appendix 124 through 126 places this subpoena in context. This is the context of a hostile attorney general who has issued a consumer alert, urged New Jerseyans to beware of pregnancy centers, and assembled a strike force against them. Were there complaints against you that stimulated the subpoena? No, Your Honor. The attorney general has never identified a single complaint against First Choice. Did you view this as a request? The briefs of the attorney general seem to suggest that this is – I've never heard the term subpoena request. But did you view this as a request? Absolutely not, Your Honor. This is not in the record, but First Choice immediately convened an emergency board meeting to discuss the subpoena. The very Latin term for subpoena means under penalty. If you look at the face of the subpoena, it twice commands First Choice to produce on pain of contempt, and it twice threatens that the failure to comply with this subpoena, not a later state court order, but with the subpoena, shall render First Choice liable for contempt and other penalties at law. Some of those other penalties at law are business dissolution. That is a death knell for nonprofits like First Choice. But you are taking a step beyond our existing precedent, right? In Bonta and NAACP, those subpoenas, failure to comply would lead right away to illegal penalties, as opposed to here, there's an additional step before you're going to be liable, right? So that is true, Your Honor, but I don't think that matters either under associational harm or under pre-enforcement review. The question for associational harm is whether a reasonable nonprofit organization or a reasonable donor would have been chilled. The Attorney General concedes the test at his brief, page 20. As far as pre-enforcement review goes, the Attorney General does not contest that there's a credible threat of enforcement here. And as SBA lists identified, there are several injuries that flow simply from pre-enforcement review. One of those is the burdens, the time and resources spent on litigation. The second is a possible imminent order of disclosure. And the third here, which may not be an issue if this court accepts the Attorney General's view, is the imminence of a penalty. But regardless, those other injuries do occur. And in this case, we have the additional chilling injury. But you're putting a lot of weight on the word imminence, right? I mean, they could proceed with an enforcement action or other penalties, as in BANTA and NAACP, but there is that additional step, right? Not at all, Your Honor, not before an enforcement proceeding. There's no question the enforcement proceeding threat is credible. The Attorney General has, in fact, entered enforcement proceedings. He has entered a motion for sanctions over First Choice's attempt to protect its donor names. And, in fact, 12 briefs have been filed at the state trial court, demonstrating the enormous burden that state enforcement alone can cause on a nonprofit organization like First Choice. You just mentioned, Ms. Hawley, sort of two theories, the associational harm theory and the pre-enforcement review theory. Could you explain to me how you view the difference between those two theories and the scope of each, and why it is that you have emphasized one? Do you prefer that one, the associational harm theory? Why? Why isn't the pre-enforcement theory the way to go here? So to answer that last question first, we're perfectly happy with the decision from this court under either theory. Under our associational harm theory, we think what First Choice needs to show is that a reasonably objective donor or nonprofit, as described as a person of ordinary firmness, would have been shilled by the coercive subpoena. We think that's clear here. Under the second theory, the pre-enforcement theory, what First Choice would need to show is a credible threat of enforcement. Again, enforcement's already occurred. The Attorney General does not and cannot dispute that. In addition, you need to show that your constitutional or federal rights were arguably burdened. Again, there's no question the subpoena arguably burdens First Choice's First Amendment rights. As far as scope goes, Your Honor, we don't think that either of them would open the floodgates. With respect to the pre-enforcement theory, there are a couple of procedural safeguards built in. To begin, you would have to satisfy the other requirements of SBA list. Basically, you would have to show a plausible federal cause of action. In addition, you would need to show irreparable harm in order to get a preliminary injunction to enjoin the state official. In most cases, outside of the First Amendment context, we think that would be relatively difficult. So we actually think the scope of those two different theories will be relatively similar, again, because of that requirement of irreparable harm. Can I just follow up by asking, I guess the lower courts really focused on rightness, which is a theory that involves the timing of your lawsuit. And I guess I'm wondering, even if we agree that your constitutional rights are arguably burdened, is it really occurring at the moment of receipt of the subpoena? I mean, I think part of this dispute is about when those burdens actually fall on an association. And it feels a little odd to me that from the moment the subpoena comes in, especially if we credit your view that it's unlawful and that they're not allowed to ask you for these things, I wonder whether the burden is really happening at that moment. With respect, Your Honor, I think an ordinary nonprofit receiving a subpoena commanding compliance on pain of contempt would find that to be chilling. I'm not talking about the chilling theory. I'm talking about the pre-enforcement theory. So either of them suffice here. But to address your question on pre-enforcement, the question is whether when the subpoena was delivered, there's a credible threat of enforcement. That credible threat is clear on the face of the subpoena. But what if you're right that the subpoena is bogus? I guess I'm just a little confused as to how this works. Because if you're right that the subpoena is wrong, is unlawful, then I guess we would suspect or expect that the state court would agree with you. And so there really isn't a credible threat that it's going to be enforced. So two responses, Your Honor. Under this court's cases like Stethel and Dombrowski, the ultimate success of a constitutional challenge does not diminish the credible threat of enforcement. This court has never required that a plaintiff show that he has a really bad case in order to get into federal court. And second, Your Honor, Section 1983, the Reconstruction Congress clearly provided plaintiffs who have been harmed by alleged state malfeasance a choice between federal and state court. First choice is simply asking for a stay in federal court here. We think it satisfies two theories of Article III standing. And with respect to the sorts of things that could happen later in the case, the Attorney General, for example, talks about negotiation. But negotiation can always occur in every case. The courts can easily handle those sorts of things through their docket management tools, but it doesn't take away the fact that Article III standing exists. In fact, to take this case as an example, the Attorney General did not narrow his subpoena until the Third Circuit granted expedited review. To find a negotiation somehow obviates Article III would give the government the whip hand in every one of these cases. I am sympathetic to the argument that the subpoena on its face looked like it carried penalties based on everything that you said, but I think we have to accept for purposes of this case that it's non-self-executing and so that it did not in fact at the moment of receipt demand that you reply in pain of contempt. Would a letter have been sufficient then for a ripeness under your theory? What if he had just sent a letter saying, I intend to send you a subpoena that will demand all of these documents, or just a letter requesting them that wasn't a subpoena. Please turn over to me all of these documents. So I think it depends. A letter depends on the facts and circumstances of the case. If it's a birthday card from the Attorney General that says, you know, I noticed your fundraising has just been amazing and my fundraising could use a boost. Could you introduce me to some of your donors? That's really different from a letter like an issue in Bantam Books, which was issued under apparent state authority and demanded donor names. So a letter could be enough. Yes, you are. Nothing here on your theory turns on the fact that it was a subpoena. The question, I think the subpoena makes it worse. Again, the Latin for subpoena is under penalty. Because it shows imminence, because it shows the likelihood that the threat will actually materialize. Yes, and because it shows it's reasonable to be chilled. And is it the burden of litigation? Is it the expense and the being forced to defend oneself? Because I think on the pre-enforcement theory, that is a concern, right? That the litigation expense counts as the injury, even that likelihood that you will incur litigation expense. Yes, Your Honor. That's why this court held an SBA list, also alluded to it in Ex Parte Younger. But I don't understand that theory. You're going to end up in assuming litigation costs no matter what. The issue is which forum, in state or federal. Because in the federal forum, even if this claim is right, it's not a given that this subpoena violates your rights until a court determines whether there was reasonable cause for the attorney general's subpoena, whether it was narrowly drawn. All the standards have to be met by the other side. But that's going to be litigated. So I don't understand how the burden of costs could ever be irreparable harm, but particularly in this situation where the cost is going to be incurred no matter what. So I think you have to rely on the chilling effect to your First Amendment rights. And if you don't rely on that, then every single case implicating an alleged constitutional violation like selective prosecution, vagueness, I could go on and on, all of those subpoenas will end up in federal court. How do those people not make the same argument you're making? So a few responses, Your Honor. First, irreparable injury is separate from the injury this court found in SBA lists, which is the burdens of litigation. We don't need to show irreparable injury. But answer my question. How is there a burden? You're going to litigate in state court or federal court, same questions. It's only an issue of who's going to answer them. So I think that's not quite correct, Your Honor, for the reason being that if we're in state court, it's because we've been forced there because the Attorney General, as he has here, has enforced the subpoena. But it's not as if you can go into state court and your motion in federal court removing and your action will be has he issued the subpoena appropriately or not. If the federal court says it was appropriate, you'll still have to answer it. But somebody will have to litigate that question. Yes, Your Honor. But I think the burden this court identified in SBA lists is the burden of being forced into state court. If there's a credible threat. I think the burden there was more the burden of the chill to First Amendment rights. The burden has always, in our cases, been the chilling effect, not the burden of litigation. So we think, Your Honor, under SBA lists, the best reading of that is that there are actually four possible imminent injuries. One is the burdens of litigation we've been discussing. One is the imminent disclosure order, in this case of donors. The third is the imminence of an adverse order on penalties. If you accept the AG's theory, maybe that doesn't exist in this case. And the fourth is the chilling injury. So you don't really need to depend upon litigation costs. You've got the other three buckets. Correct, Your Honor. Even under the enforcement as opposed to chilling theory. Yes, Your Honor. A question about your discussion so far on the subpoena has taken as given that it's non-self-executing. Why? I don't think you need to, Your Honor. Under this court's case law, where a lower court's determination of state law is as plainly incorrect as it is here, this court need not defer. And I can explain why that state law determination is wrong. But a prefatory note that it doesn't matter. In this case, even if the Attorney General's subpoena is non-self-executing, first choice and if donors were reasonably chilled. I understand. We've got that point out already. But I just wanted to give you an opportunity to address the state's argument that it's not self-executing. Thank you, Your Honor. The state says the subpoena is voluntary. That's not what the face of the subpoena says. It says command or else will possibly go up to your business license or you'll wind up with contempt. That's not what the state law says. If you look at the last page of our opening brief, it details section 5686. It says that if you fail to obey the subpoena, again, not a later court order, if you fail to obey the subpoena, you could be subject to contempt, you could lose your business license. Those are the death knell for nonprofits like First Choice. It's also not what the Attorney General said in either this case or in Smith & Wesson. In this case, he told the state court three times that the mere failure to comply with the subpoena by producing documents violated three separate state laws. It's the JA 50, 53, and 59. And, finally, in the Smith & Wesson litigation, the Attorney General argued in the younger context that subpoenas have the force of law, that they can be immediately opposed contempt, and, in fact, he sought contempt in that case for a mere failure to comply. Thank you, Counsel. Justice Thomas, anything further? Justice Alito? When was the first time the Office of the Attorney General took the position that subpoenas like this are not self-executing? To my knowledge, Your Honor, in this case. What are we talking about here? Are we talking about Article III standing, which would be assessed at the time when you filed your complaint? Are we talking about events that occurred later, which I think would be analyzed under the doctrine of mootness, and your friends would have the burden of showing that the case had become moot? Are we talking about prudential standing? Are we talking about Article III, I'm sorry, prudential ripeness? Or are we talking about Article III ripeness? If so, is that any different from the standing inquiry? Yes, Your Honor. So we think the best way to look at this case is an Article III injury in fact. In SBA lists, this Court equated Article III injury in fact with constitutional ripeness. We don't think, since Lexmark, that prudential ripeness is necessarily something this Court is looking to expand. So we think the question is whether first choice has satisfied a present or future injury. That would be assessed at the time of the complaint. But you can look to the future enforcement to show that the chill and the credible threat of enforcement were credible and objective at the time the complaint was filed. Thank you. Justice Sotomayor? Justice Kagan? Justice Gorsuch, any further? Justice Kavanaugh? Justice Jackson? I actually have a question. I guess I'm just trying to understand what has happened to the eminence requirement in your argument. Because I do see, I appreciate that you're saying that we could have a situation in which the State Court ultimately requires you to, you say, unconstitutionally disclose this list. But that's not certain to happen. And ordinarily in standing for future injury, for risks of future injury, we require in all other kinds of contexts a really clear showing that the thing you say is going to happen, that you fear is going to happen, is eminent. And so I'm just a little nervous about this. And I'm just wondering, have we created a separate doctrine, a different doctrine, for First Amendment? Because we normally don't relax it, I think, in this way. So I think two responses, Your Honor. First, first choice has alleged a present injury. If you look at the- The chill. Yes. Yes. I'm doing your other theory. All right. The chill I get. Yes. The other theory. So with respect to the pre-enforcement theory, I think this Court's most recent precedent on that is SBA-led. Yes. And what the Court said is that when you have a credible threat of enforcement, that means these other injuries are sufficiently eminent. And even accepting the Attorney General's theory that maybe first choice is not immediately subject to contempt, we think that's wrong. But even if that's correct, you do have those other three eminent injuries. Which are? They are, sure, the burdens of litigation, the fact of an eminent possibility of a disclosure order for donors. But that's not eminent, right? I mean, that's many steps away. So in SBA-less, this Court considered the possibility of an adverse action. The credible threat in SBA-less takes the place of the eminent. I see. Okay. Yes. If you have a credible threat. And that makes sense, Your Honor, because- And I'm sorry, the credibility of that threat doesn't turn on whether we think the Court is actually going to do that. You don't have to show that the Court is actually going to do it. It's still a credible threat because- Exactly. Under Dombrowski, under Steffel, this Court has never required criminal defendants and others to show that they might actually be punished. Which makes sense, again, because if the law is super unconstitutional, that doesn't mean you sort of talk yourself out of federalism. Isn't it interesting that we don't have credible threat in other areas? I mean, I'm thinking about, for example, Perdomo and, you know, the situation-I'm looking for it in my notes- in which people are saying we're fearing that we're going to have these adverse interactions with ICE. We have evidence of this happening, and the Court seems to say not enough. We don't employ some sort of a credible threat analysis in that context. Sure, Your Honor, and that's actually why we think the First Amendment associational harm here is important in addition to the pre-enforcement, because as you identify, if you have an investigation, the pre-enforcement threat is not going to come into play in that context. So we think there are cases like Bantam Books, like Speech First, which Respondent identifies, in which pre-enforcement will not be applicable, and this Court should make clear that the First Amendment protects those interests and standing as well. Thank you. Thank you, Counsel. Mr. Shuri. Mr. Chief Justice, and may it please the Court. A plaintiff has Article III standing to challenge a subpoena so long as the plaintiff faces a credible threat that the subpoena will be enforced against it. The plaintiff doesn't need to make a further showing of a chill on its associational activities. The chilling effect is relevant to the merits of the First Amendment claim, and it's also important to establishing irreparable injury, but it isn't necessary for Article III standing. The judgment of the Third Circuit should be reversed. So what is the basis, which argument do you think is the preferable approach here? We have proposed the credible threat theory rather than the objective chill theory for two main reasons. The first of which is that this Court has had many cases about credible threats of enforcement and pre-enforcement challenges. That is a well-developed doctrine. So let's just stop there a second. What is the threat here? The threat here is that the State will begin, in fact has already begun, a suit to enforce the subpoena if the materials are not turned over, imposing litigation costs on First Choice. Let's assume that this was before any suit had been filed in State court to enforce the subpoena. Still standing, as long as the subpoena had been issued, because at that point, First Choice faced a credible threat that the suit would ultimately... What if, as Justice Barrett asked, it was simply a letter request? In that case, almost certainly no standing. The reason being that a mere letter doesn't carry the same threat of enforcement as a subpoena would. Now we could envision some hypothetical case closer to Bantam Books where a letter in practice operates much like a subpoena under some State's unusual scheme, but setting that aside, there would not be standing. So to make sure I understand your answer to Justice Thomas, a threat of a subpoena is not enough. It has to be an actual subpoena. That's correct, Mr. Chief Justice. I was just going to ask you on this, was this really non-self-executing or self-executing? You say in your brief we'll accept the lower court's characterization of it as non-self-executing. Correct. It's my understanding that the New Jersey court treated it that way too. I don't know that there was an express holding by the New Jersey court, and maybe the Attorney General can address that. What is your view of the best reading of this statute? We accept that New Jersey subpoenas are not self-executing. The face of the subpoena suggests that it is self-executing, but we accept that regardless of what the subpoena says on its face, the courts have treated it as non-self-executing. And the face of the subpoena, however, the language that it used, does go to the credible threat theory, which seems like that was part of your answer to Justice Thomas in distinguishing the letter from the subpoena. That's correct. What problems do you see with the chill theory? There are two main problems. The first is that this court has a series of cases saying a subject of chill is not enough for Article III standing, Laird v. Tatum, Clapper, and Whole Woman's Health v. Jackson. So you'd have to draw a distinction between an objectively reasonable chill and a subjective chill. The second is that the chill is highly relevant to the merits and to irreparable injury, and there's a risk that courts might conflate the Article III requirements with the merits requirements. You'd have to draw fine distinctions about, for instance, whether a particular degree of chill may be sufficient for Article III but not necessarily sufficient on the merits to prevail on the First Amendment claim. If the court is uncomfortable, however, with the breadth of our credible threat theory, then the backup we would urge the court to adopt is to say credible threat plus a chill is enough, leave for another day, whether the credible threat alone would be sufficient. That's an interesting question because what you're basically saying is anyone with a constitutional challenge of any kind, the ones I mentioned, selective prosecution, vagueness, whatever, has automatic standing to come to federal court. That's your theory. A person has standing, but there are other obstacles that would keep many of those litigants... But those obstacles will always involve the merits to some extent. They're going to involve that plus chill no matter what, correct? No, the most important obstacle is irreparable injury, and chill is very important to establishing irreparable injury, which is a higher bar than Article III injury, and that's the main gatekeeper in our view. How many states are the subpoenas self-executing and how many of them are? Do you have any idea? I don't have exact numbers, but my understanding is that the general practice is that subpoenas are not self-executing. That's true at the federal level and in the states as well. In assessing the threat at the time when the complaint was filed, is it relevant whether it turns out later as a result of litigation in federal court or state court that the subpoena was not self-executing, or is the degree of threat to be assessed based on what one would know at that time regarding whether it was self-executing or not self-executing? The normal rule is that standing is assessed at the time that the suit is brought and that doctrines like mootness affect whether later developments change standing, and I understand there to be disputes between the parties about whether at the time the suit was brought it was clear that this subpoena was in fact non-self-executing, but we're willing to accept that for purposes of this case because the outcome in our view doesn't turn on that feature. If I understand your position correctly from your brief, you think that the federal government is actually in a different position from the states with respect to the pre-enforcement theory, that because of the APA the federal government would not be vulnerable to these kinds of actions. Is that correct? In general, yes. There are some narrow statutes where Congress has authorized pre-enforcement motions to quash, and in those contexts there would be Article III standing. I guess it leads to the obvious question as to whether you would have picked the theory that you picked if you were standing in the same shoes as the state is standing in, because Mr. Iyer will tell me if I'm wrong, but I took from his brief that the state was actually more concerned with the pre-enforcement theory than with the chill theory, that it seemed to it more disruptive of its ordinary processes of enforcement. I appreciate that concern, and we agree that pre-enforcement challenges can in some circumstances be disruptive, but we just don't think Article III is the correct tool for addressing that concern. Instead, the main tool should be the irreparable injury requirement. There should be no basis for granting a preliminary injunction unless there is some irreparable harm that will be suffered before the state court ultimately orders enforcement. In the vast majority of subpoena cases that won't be the case, but in First Amendment chill cases, that often can be shown. If there's no possibility of getting the preliminary injunction because you can never show irreparable harm, is it redressable? It's redressable because you have to accept the party's allegations and merits arguments for purposes of assessing standing, even if ultimately those arguments turn out to be incorrect. Let me ask you this. I wonder why, and I'll follow up on Justice Kagan, I'm curious that the government didn't want to touch the chill theory. If the court were to adopt the chill theory or reject it, would it have an effect on federal litigation? Would, is it Reisman and Claire Furness, don't really address a chill theory? And I wonder whether in federal litigation, an abusive subpoena seeking to chill First Amendment rights could be challenged or whether under your view you'd have to wait until the end of the case. The chill theory would not affect federal litigation because the chill theory goes to Article 3 and our objections to the pre-enforcement suits in federal litigation involve the existence of a cause of action. A remedy at law. But if the only remedy of law is waiting until the end of the case and the chill will have been manifested before then by having, say, to disclose your lists of donors, I would have thought that equity could step in there, no? There are narrow circumstances in which UltraVera's review in equity would be available, even with respect to federal subpoenas, but as the court said in its Nuclear Regulatory Commission decision last term, the standards for that are quite high and it would be a very narrow exception. But we don't have concerns with adopting a chill theory so long as the court says that a credible threat... You're not suggesting that the federal government has more ability to not just chill but to infringe upon the First Amendment than states do? No. Okay. I'm suggesting only that Congress has made different decisions about what types of causes of action to provide. Well, I understand that, but if the cause of action is inadequate because it comes at the end of the case after the damage has been done, surely the government can't take the view that the First Amendment has no opportunity to step in and those arguments to be presented. No, that's a good argument to make to Congress for creating new causes of action.  To Congress, yes. So somebody who faces an abusive subpoena by the United States government has to go ask for Congress to change the law?  As I've mentioned, there is a narrow exception under Ultraviere's review, but in general, the ability to challenge it in federal court comes at the end of... Why would it have to be Ultraviere's? Riesman and Claire Furness talk about the adequacy of a remedy at law as being the point. And if there isn't a remedy at law, it says equity can step in. Ultraviere's review is nearly another term for the same equitable action that... Okay, you're saying it's the same thing. Thank you, counsel. Justice Thomas? We made clear that the Ultraviere's review is really close to non-existent. Exactly right. It is very narrow, but it is theoretically available in some extreme circumstances, yes. Do you have an example? Liedemankind is the one that comes to mind. That was a long time ago. A one-off. The amendment is being violated. I gather that's not good enough. No, because in most cases, the opportunity to get a federal court to adjudicate the lawfulness of the federal subpoena is provided at the end of the subpoena enforcement process. And therefore, there isn't the same question as arises in this case about losing the federal forum entirely. Justice Barrett? Justice Jackson? I'll just ask you, in response to Justice Barrett, when she asked about the chill theory, you said there were two problems, one of which is the fact that there's a merits connection, and that you saw as a problem. I guess I'm still struggling to understand why the pre-enforcement theory and the aspect of injury that relates to the possibility that you're going to be ordered to disclose, why isn't that also bound up with the merits? I mean, it will only happen if you are wrong on the merits of your challenge. So I see, for example, the litigation cost theory of pre-enforcement, that you're going to spend this money, and it's not bound up with the merits. You've got to do that anyway. And so I understand that as a potential injury, notwithstanding Justice Sotomayor's point about you having to incur it anyway. But the idea that you're going to be injured because there's the possibility that the court will rule against you seems to me to be bound up in the merits. No, Justice Jackson. No? Okay, why not? Pre-enforcement challenges are a staple of federal litigation. And in those challenges, what a court does is simply ask, is there a threat, a reasonable, objective threat, that the state will begin proceedings or that the prosecutor will begin proceedings? To determine standing, you don't need to make a further inquiry into how likely it is that... That's because you're injured because they brought the proceedings? Is that the injury? That's the injury. Okay. Thank you. Thank you, counsel. Mr. Iyer? Mr. Chief Justice, and may it please the Court, petitioner's factual allegations do not show that the issuance of this subpoena objectively chilled petitioner's First Amendment rights. To some of the colloquies this morning about state law, New Jersey state law establishes that subpoenas do not require anyone to produce documents and a party faces no penalties for non-production. Any legal duty to produce documents, and in this case, any disclosure of donor identities, is instead wholly contingent on a future state court order requiring production. This case is a perfect illustration. The state court has repeatedly declined to order production over two years of litigation. That helps explain why petitioner never alleged below that anyone actually has been or is objectively likely to be chilled by this subpoena. Instead, at most, the complaint alleges that the subpoena itself quote, may cause donors to stop contributing. But that contingent language has never been enough for Article III. The federal government's alternative credible threat of enforcement theory of standing is even worse. State and local governments issue tens of thousands of subpoenas every year. But the federal government's theory would risk turning many of these ordinary subpoena disputes into federal cases, even without a First Amendment claim. That would be a remarkable break from history and tradition. No court has accepted that theory, and this court should not be the first, particularly in a case where the question presented was itself limited to chill. Of course, plaintiffs who receive an administrative subpoena may have Article III standing in some circumstances, where, for example, the recipient faces some concrete harm or legal penalties from the moment of the subpoena's issuance, or where the recipient alleges that the subpoena is connected to other government statements or actions that themselves create objective chills. Petitioner hasn't alleged anything of the sort here. I welcome the court's questions. What is the difference between this subpoena and a request? Your Honor, this subpoena is a predicate under state law for the state executive branch to be able to go to a court to seek a court order requiring production. We couldn't do that if we had just sent a letter request. But in other critical respects, there's really not a difference in terms of the legal obligations that are actually imposed upon a recipient of a subpoena. Justice Thomas, I think to your questions at the outset, you had made a remark about how this subpoena doesn't look like other kinds of subpoenas that you're familiar with, and I think there is some confusion in the nomenclature here. Typically, when we think about subpoenas, we're thinking about grand jury subpoenas or subpoenas that are issued by a court during civil litigation. I think an administrative subpoena is very different, and courts, as a matter of state law, have held across the country that these subpoenas themselves don't impose any obligation to produce documents from the moment of the issuance of them. So what's the difference between this and a request? So I think there is not a difference in terms of the change in legal obligations for petitioner. So if I were to request these documents from an organization that is an administrative agency, would I write this sentence, failure to comply with this request, I'm substituting request for subpoena, failure to comply with this request may render you liable for contempt of court. I do want to directly address that because I think that's the nub of a number of the questions this morning and a number of the colloquies this morning. So the subpoena does say exactly what you said, and it says that an individual who receives the subpoena is commanded to produce. But just a couple pages down in the subpoena, this is at Petition Appendix 93A, the subpoena itself says that one entirely appropriate way for a party to respond is to object to some or even all of the requests contained in the subpoena. And as a matter of background, state constitutional due process principles, New Jersey Supreme Court has long held that the executive branch can't be the one that's deciding on those objections. But counsel, I didn't take that position below. Everything you're saying, if the New Jersey Supreme Court has long held that, I thought you took the position below that the obligation attached the moment the subpoena was served. That's not correct, Your Honor. Throughout this litigation, we have consistently taken the position that this subpoena is not self-executing. What Your Honor may be referring to is the position that we took before the Third Circuit in the Smith and Wesson case several years ago, several years before the start of this litigation. And I'll be completely candid with the Court. We took the opposite position in that Smith and Wesson case. We ultimately lost Judge Hardiman's decision for the Third Circuit, rejected that theory, and what Judge Hardiman... I think that it cited one superior court decision from New Jersey as authority, which is something, I suppose. But it's not the New Jersey Supreme Court. You don't cite the New Jersey Supreme Court in your brief before us. You cite the Third Circuit decision. And just looking at the statute, it says the AG subpoenas have the force of law. And if a person fails to obey the subpoena, the AG may apply to the superior court and obtain an order of judging such person in contempt of court. Now, I don't know how to read that other than it's pretty self-executing to me, Counsel. Now, maybe that's anomalous. Maybe that's wrong. Maybe the New Jersey Supreme Court's read it differently. But that's not the materials I have before me, so help me out.  So we think there are a number of reasons why these subpoenas need to be understood as non-self-executing. Lots of reasons, but how about some authority? Yeah, absolutely. What you got besides that trial court decision? Yeah, so the New Jersey Supreme Court in Silverman v. Berkson, which is a case that's cited in the amicus briefs, that 661A2-1274 is a 1995 New Jersey Supreme Court case. I think the Third Circuit had that before it as well. The Third Circuit to Charterman canvassed state practice in coming to that decision. Now, I do want to be absolutely clear with the Court. If you disagree with us as a matter of state law on whether or not this subpoena is self-executing... I'm just trying to get to the bottom of it. Absolutely, but... Do you think Silverman answers the question? I do think Silverman speaks very strongly to that question. Speaks strongly to the question. That's a little bit different counsel. I do think there are background constitutional principles that make very clear that... Background constitutional, all right. You were about to say, if we disagree with you, what? Yeah, if you disagree with us and think this subpoena is self-executing, there is no dispute that Petitioner would have standing from the moment of the issuance of the subpoena. There would be consequences that flow if the subpoena is self-executing from the moment of the issuance of the subpoena. What was the date of the first occasion when your office took the position that a subpoena like this is not self-executing? Your Honor, it was in... I'm sorry, is self-executing. I'm sorry, is not self-executing. When did you first say, on the record, someplace, this sort of subpoena is not self-executing? We took that position from the start of this litigation. Where would I look to see that? So I think you would look to the position, to the JA, for example, to our state court enforcement action, where JA 59, we're not seeking penalties for their failure to comply with the subpoena itself. All we're seeking from the state court in a production order is an obligation to produce documents. I do, I think, to the nub of your question, Justice Alito, this is the first time that we've had to directly come across a First Amendment challenge since Smith v. Wesson, which is why we haven't really raised these issues prior to this litigation. We don't, as a matter of course, I do want to be clear about this, we don't, as a matter of course, seek penalties for the failure to comply with a subpoena. Putting this litigation aside, wouldn't you prefer for your subpoenas to be self-executing? Sure. The Third Circuit held otherwise in Smith v. Wesson. Do you view your position in this case, the reason that you took this position, did you view it as like you were required to take this position by the Third Circuit? Is that the issue here? We do ultimately think that Judge Hardiman got it right in Smith v. Wesson, and our job, first and foremost, is to interpret the statutes that our legislature has given us. If the legislature decided that it wanted to give the Executive Branch self-executing subpoena authority, we'd be happy to use that authority, but that's just not the statute that we have. Just putting on your lawyer's cap, you decided that Judge Hardiman was right. Yeah, ultimately... That's right, and Judge Hardiman's opinion for the court ultimately canvassed state practice. It dealt with all of the arguments that we had made before the court, and I will say that if, again, the question that this court has is about the meeting of state law, I think there are entirely appropriate ways to resolve those questions, for example, by remanding the case to the Third Circuit with instructions to certify the question to the New Jersey Supreme Court, as is consistent with typical practice. And the question is, with respect to self-executing, just so I understand what you mean, what would a self-executing subpoena look like versus what we have here? Yeah, so the difference between a self-executing subpoena and this subpoena. So a self-executing subpoena would impose some penalties or consequences from the moment of the issuance of the subpoena itself. If the person didn't respond. Correct. So you could go to court, the AG would go to court and not ask for litigation over whether or not they had to respond, but just ask for a penalty to be imposed. That's a self-executing subpoena. That would be a self-executing subpoena. So what do we have here? Not that. Not that, because the AG has to make a request to the state court, and any production of documents, any legal obligation to produce documents, is entirely contingent on a future state court. Well, I've got to say, putting my lawyer's hat on, if I were a New Jersey trial court, I would still be making the argument that New Jersey courts are not bound by the Third Circuit's decision that this is self-executing. But I want to put that aside for a second and ask you, you said in your opening that if we adopted this pre-enforcement theory, we would be throwing the door open wide and that there would be all manner of challenges in federal court to subpoenas issued in New Jersey. Can you give me some examples of this Pandora's box? Yeah, it's a difficult question to answer, I think, Justice Barrett, in part because this would represent a pretty dramatic sea change in historical practice. Petitioners in the United States haven't identified a single case that adopts this credible threat of enforcement theory for subpoenas in particular. So this would be a pretty extraordinary change, and I think the risk would be that federal courts would potentially be inundated by these subpoena cases. And what kinds of cases? Are we only talking about First Amendment cases? Are we talking about other constitutional challenges? I don't see a way to limit the United States' proposed rule just to First Amendment challenges. I think it would encompass Fourth Amendment challenges to Justice Sotomayor's examples earlier, due process challenges, extraterritoriality challenges. Just to put this in perspective, the single state agency that is before this court today from a single state has issued more than 500 subpoenas this year alone to all kinds of businesses, to home contractors, to car dealerships, who we have reason to believe could be violating the law, and so we want more information. Google, in its public disclosures, the single company, said in 2024 it alone received 50,000 subpoenas across the entire United States. You're talking about a huge volume. You're talking about many different kinds of potential federal constitutional claims, and I think all of that is why the United States is asking for a bespoke exception for its subpoenas in particular. I'm sorry, finish your answer? Yeah, the United States is asking for a bespoke exception for its subpoenas in particular, and I'll also say, as a final note on this point, that petitioners themselves, on page 22 of their reply brief, says don't reach the questions about the credible threat of enforcement outside the First Amendment. You can resolve this case on chill. We agree, ultimately, chill is the right framework for resolving this case, and I would think if this court wants to take up the credible threat of enforcement theory, it would want briefing, for example, on some of the history and tradition arguments that we had raised in our red brief and that the reply just doesn't address, and so I think that this court can appropriately leave those questions for another day and decide this case on the basis of chill. Counsel, you referred to the fact that you've addressed these subpoenas to car dealerships and things like that. Your friends on the other side don't represent a car dealership. Do you think there is a credible chilling effect from the state seeking full names, phone numbers, addresses, present or last known place of employment of every one of their donors who gave through any means other than the one specific website? In other words, do you think they have a credible chill concern? I don't think that, and I think that's best illustrated by the allegations that are in their complaint as well as in the supporting declarations in support of their motion for a preliminary injunction. So if you look at their complaint allegations, all of the harms they identified are tethered to a future downstream state court order requiring disclosure, but they're not tethered to the subpoena itself. As I noted in my opening, I think the closest they get in their complaint is that Petition Appendix 137, this is Paragraph 125, where they say the subpoena quote may cause people who associate with First Choice to reasonably fear that they themselves will face retaliation or public exposure. That may cause language has never been sufficient for Article 3. The rest of the allegations in their complaint, take a look, for example, at Paragraph 73 or Paragraph 76 on Petition Appendix 130. Those allegations are focused on the harms from the disclosure of documents that identify First Choice donors, but all of those harms, again, are contingent on a future downstream state court order. So you don't think it might have an effect on future potential donors to the organization to know that their name, phone number, address, etc., could be disclosed as a result of the subpoena? It certainly has not in this case. I take Petitioner... How do you know that? So I take Petitioner in their reply brief, in this case, to all but concede that there's not been any evidence of anyone actually being chilled by this subpoena over the two-plus years of litigation. How do you get that evidence? Somebody comes in and say, I'm chilled. I don't want to reveal my name, address, phone number, etc., and here's my affidavit. That's not going to work, is it? I absolutely think that that is something they could have pled here, but they did not plead it. And I think if you look at the declarations that they submitted in support of their motion for preliminary injunction, I think it's the same problem. So if you look at the donor declaration, they submitted a declaration on behalf of anonymous donors. This is that Petition Appendix 174 to 178. There's no allegation of any prospective chill for any of those donors. I think the closest they get in this entire case, based on this factual record, to alleging chill is at Petition Appendix 177. This is the donor declaration, Paragraph O, which says, quote, each of us would have been less likely to donate to First Choice if we had known information about the donation might be disclosed. But that's a backwards-looking statement of harm. It's not about prospective chill.  I mean, we're going to now pick over the tense of the verb that they chose? I mean, they're saying if we'd known that this was going to happen, we wouldn't have given. Perforce, if it's going to be disclosed, we won't give. I mean, doesn't that just follow night from day? We don't think so for a couple of reasons. First, this Court's decision in Lyons makes perfectly clear that a backward-facing allegation of harm. I understand that when you're dealing with prospective harms, but that allegation seems to me... I mean, really, that's what this case turns on, is the tense of that verb. I think that's the closest they get to standing. I do want to explain why we think it is particularly the case here that their backward-looking allegation really can't establish... What if they had said... What if they had used the future tense? If this information is disclosed, we will not donate. I don't think that would be... That wouldn't be enough? No, because that allegation that you noted is tethered to whether or not there will be disclosure. But I think the harms that they're identifying have to be tethered to the subpoena itself. I think this goes back to some of the colloquies earlier this morning about whether you can have standing based on the issuance of the subpoena from the moment of the receipt of the subpoena itself. If Petitioner had alleged that there were chill harms, and those chill harms need to be objectively reasonable, but if they had alleged chill harms from the moment of the subpoena's issuance... So they have to allege that in the complaint? They have to allege specifically in the complaint that donors will be chilled? Yes, I think so. And they have to be chilled by the issuance of the subpoena. So what's wrong with, then, if the tense is what matters, what's wrong with paragraph P? Yeah, so I think paragraph P suffers from the same problem. It says, if our personal information is disclosed... Yeah, that's future, right? That's future, but it's about a future state court order. Okay, all right, so really it doesn't boil down to the past tense. It boils down to your argument about self-executing versus non-self-executing. And your assertion at the end of the day that because it's non-self-executing, there's no threat of chill. Yeah, I think just to be really clear... So really, we can get past these tense issues, then, right? Yeah, just to be really clear about this, if this subpoena were considered self-executing as a matter of state law. I've got that. You don't even need to get it to chill. I know. We're dealing now with... I think your argument ultimately has to be that non-self-executing subpoenas can never be enough. I think that's your position, because I think you're conceding that, okay, they've got the right tense in P. Fair? So they've got the right tense in P, but they've got the wrong thing in their... But suppose that they had the right thing. Suppose that they said, you know, if there were a subpoena issued that even those... You know, if there were a subpoena, even though non-self-executing that were issued, because of the possibility that it would be executed on by a court, I would not contribute. I think that would be sufficient to allege chill, but that's not necessarily enough by itself to get to that chill being objectively reasonable. So our position in this case is that they need to do two things. They need to allege that there has been chill. I think they fail at the outset on that metric, but they also then need to allege facts indicating that that chill, based on the issuance of the subpoena... And does that depend on how often courts deny these subpoenas? I mean, suppose that you think courts basically order these subpoenas complied with 98% of the time. I don't know if that's true, but suppose it were. I don't think still that would be enough. That's basically the set of facts that this court had before it. So just to... Could I get the answer to my question? Yeah, that's basically the set of facts that this court had before it in Clapper. Now, Clapper is most commonly understood as a case about the standing analysis that applies when there's no evidence that the government is specifically targeting an entity. But at page 413 of the Clapper decision, this court said even if the respondents in that case could establish that there was particular targeting of the communications of the respondents in that case, that's still not enough for standing because it is contingent on a court order. In that case, it was the Foreign Intelligence Surveillance Courts order. I think in Clapper, Justice Breyer pointed out in the dissent that there were 1,676 applications that were made. Over 98% of them were granted without modification. And this court still said that we don't rest our standing theories on guesswork about the actions of independent decision-makers, particularly where those decision-makers are courts. So is that why Mr. Suri says it's bound up in the merits, the chill argument? Is that what your understanding is of his concern about chill as an argument? I take that to be a different concern. I take that concern just to be that, as this court's decision in AFP illustrates, one factor that a court considers in the First Amendment analysis is the risk of a chilling effect, and that's relevant to the merits. But I don't think that means that you can't also consider chill for purposes of standing. It's a different kind of analysis. So you say consider it, but because of this Clapper point, it's not shown here enough. Yeah, I think that's right. Now, I do think that there may be a limited class of cases where a party could allege that it facts sufficient to support standing based on the issuance of a subpoena alone, and I think there are three categories of these kinds of cases. The first is where there's some kind of concrete harm from the issuance of the subpoena itself, and I'll come back to each of these examples if the court wants. Second is where the subpoena forms one part of the basis for a credible threat of enforcement of the underlying statute that actually regulates the conduct of the plaintiff in the case. And then the third is, with respect to objective chill, it's been our consistent position throughout this litigation that the mere issuance of a subpoena without more can't establish objective chill, but... That's got to be your bottom-line argument in response to Justice Kagan's questions, is that just the issuance of a subpoena cannot, no matter what the allegations are, be a basis for an objective chill. So I think there is a caveat there, which... OK, what's the caveat? ...brings together cases like Laird and Bantam Books, which is that if there are other government actions or other government statements that are linked to the subpoena that themselves would create an objective chill by establishing a credible threat of... But that's something else. You're saying that you have to have something additive, but just on its own, you're asking us to adopt a position that can never be enough. Just on its own, without any additional facts, statements, actions. But in this case, weren't there? I mean, you had this project strike on the pregnancy centres. The Attorney General had essentially, what your friend on the other side would say, declared war on pregnancy centres. So if it is true that the non-self-executing subpoena is enough if it's in the context of other government statements, why wouldn't that be satisfied here? My friends on the other side don't let the actual factual allegations get in the way of telling a story about hostility here, but I think that story is just not borne out by the record evidence that's been offered here. So ultimately, I think at the end of the day, what they're identifying are policy disagreements that they have with the Attorney General. That's never been enough to establish hostility. It's never been enough to establish standing. I think with respect to the specific allegations, Justice Barrett, that you're noting, they point to a consumer alert that we had issued about crisis pregnancy centres, and they also point to a reproductive rights strike force. I'll take each of those points in turn. I think first with respect to the consumer alert, which is on JA 357 to 362, all that consumer alert is doing is telling people what the mission of organisations like crisis pregnancy centres are. I don't take Petitioner to be disputing the point that we make in that consumer alert, which is that crisis pregnancy centres are entities that seek to deter women from accessing abortion care. They do take issue with our statement in that alert that there may sometimes be misrepresentations or false statements that are made in the provision of medical care, but I don't think it's evidence of hostility to have a targeted consumer alert that identifies a potential risk of misrepresentations, and then a subpoena that's specifically targeted to address whether those misrepresentations occurred. If it were otherwise, then every time the state issues a consumer alert about car dealerships or home contractors, that would somehow establish hostility. We don't need to get into the record here, but if it were the case that there were this surrounding context, would that be enough on your theory? It depends on what that context is. That might be a context in response to Justice Gorsuch's question where if there were more, if there was a non-self-executing subpoena plus some other background, we don't need to get into whether this is enough, but you concede in the abstract that might be enough. Yes, we do, and maybe I could just illustrate with one or two examples of what might be sufficient to establish standing. So if there were statements made by a public official who's issuing the subpoena that they want to publicly expose donors to a particular organization, or for that matter, to all non-profit organizations, I think that's the kind of credible threat of future harm that could be sufficient to get you in the door for a challenge to the subpoena. I think same thing if there are statements or actions specifically targeting the donors for enforcement, saying we want to bring to justice not just this organization but all of its supporters. I think that could be sufficient. We just don't have anything like that in this actual record here. Turning back, if I can. Well, before you turn back, suppose that the complaint here had been filed right after your initiation of enforcement proceedings in state court. Would there be article freestanding then? We don't think so for exactly the reason I had noted in response to Justice Kagan's question earlier. In that circumstance, the issuance of a state court order requiring protection would still be too contingent. So they have to litigate the matter in state court, and until a state court orders them to comply and in doing so rejects their First Amendment challenge to the subpoena, they cannot go to federal court. That's your position. As I noted earlier, we do think that there are a couple of categories of cases where they might be able to go to court based on the issuance of the subpoena alone. I noted a first category. Well, let's talk about this case. In this case, your position is that they need to litigate this in state court and until the state court rejects their First Amendment claim and orders compliance, they cannot go to federal court. But at that point, aren't they precluded? I mean, you've sort of made it impossible for them to make their claim in federal court, right? So let me maybe address that preclusion point head-on. We think there are a couple of reasons why the fears of the preclusion trap that this court identified in Nick just don't apply in this context. For one thing, this court has always made clear that you don't bend the rules of Article III standing based on potential fears of preclusion. And in cases like Whole Woman's Health, for instance, this court noted that there may not always be available a federal forum for a federal constitutional claim challenging subpoena. So you're not saying they wouldn't be precluded. You're just saying there are times when it's too bad. So I think there could be a narrow set of circumstances. I'll grant you here we think they would be precluded. They would be. Under New Jersey principles of preclusion. Of course, under the Full Faith and Credit Clause, you apply state preclusion principles, and there might be other states that have different kinds of rules related to preclusion. But I think in part because there are some circumstances, as I noted before, and again, I don't think this case fits into this bucket, but because there are some circumstances where a party would have access to a federal forum, I don't think it is invariably true that a party would necessarily be precluded just by the issuance of a subpoena. Thank you, Counsel. If your client, or I'm sorry, your friend's client, had complied with the subpoena and the state of New Jersey had full names, phone numbers, addresses, place of employment, and all that, of donors, what was the state going to do with that information? We've been very clear about this from the outset. Our entire purpose in asking for the category of donor information that we asked about was to evaluate whether any donors themselves might have been deceived by the representations on the donation pages maintained by First Choice. I'm happy to disclaim from the podium here we have no interest in seeking enforcement against any of these donors. We have no interest in publicly disclosing any information about these donors. It is purely for the purpose, we are asking for that information, purely for the purpose of evaluating whether donors might have been harmed. Our precedents give protection to donor privacy in situations of charitable solicitation. Would those apply here or not? We don't dispute that those precedents would supply the relevant framework. I think that's a merits question, not a standing question. I think this Court's decision in Americans for Prosperity would supply the relevant framework, although I would note, and this, again, I think goes to the merits analysis, not to the standing analysis, so I don't think the Court needs to consider it here, but one of the modes of seeking information about donors that this Court pointed to as more narrowly tailored than the blunderbuss regulation that was at issue in AFP was a targeted subpoena towards a particular entity where the state has concerns about potential deceit or misconduct of some sort. Thank you, Counsel. Justice Thomas? Did you have complaints that formed the basis of your concern about the fundraising activities here? We certainly had complaints about crisis pregnancy centers. No, about this crisis pregnancy center. So I think we've been clear from the outset that we haven't had complaints about this specific. So you had no basis to think that they were deceiving any of their contributors? I don't think that's correct, Your Honor. I think we had carefully canvassed all of the public information that is provided on the website of First Choice in making a determination that we wanted to initiate an investigation. But you had no factual basis? I don't think that's true, Your Honor. I think, for example, you could take a look at a comparison between the donation page for First Choice that we have carved out from the very beginning. So you had no complaints? We had no complaints, but state governments, federal government, initiate investigations all the time in the absence of complaints where they have a reason to suspect that there could be potential issues of legal compliance. And look, it could be the case, based on our investigation, when we look at documents, when we look at information, that ultimately will determine that First Choice isn't liable for any violation of the law. Well, that just seemed to be a burdensome way to find out whether someone has a confusing website. But you said earlier that you did not agree with their characterization of why they were being put to this. And it would seem that the obvious way to refute that was to say we had 100 complaints. But you say you have no complaints, but rather you looked at the website and their materials and you think it could have been misleading. So why is your characterization any better than theirs? So, Your Honor, I'd point you to the Turner Declaration, which is at pages 400 to 401 of the Joint Appendix, which lays out the predicate for the state's investigation of First Choice. And we had concerns in four buckets. We had concerns about potentially misleading donors. We had concerns about the unlicensed practice of medicine. We had concerns about patient privacy practices. And we had concerns about potentially misleading or untrue medical statements. So I think we had a more than ample basis to initiate this investigation. But you had no complaints? We had no complaints, but I think that, Your Honor, that goes at most to the merits. That doesn't go to the standing analysis. Justice Alito? Justice Kagan? That argument, Mr. Irie, that you mentioned from Justice Breyer in Clapper, I remember agreeing with that argument. And the reason is it's a very commonsensical argument, and it's basically like, what's an ordinary person supposed to think? And what's an ordinary person supposed to do based on what an ordinary person is supposed to think? And I think here, too, you would make the same argument, is that an ordinary person, one of the funders for this organization or for any similar organization, presented with the subpoena and then told, but don't worry, it has to be stamped by a court, is not going to take that as very reassuring, in the same way that Justice Breyer said the people in that case were not going to be particularly reassured by the fact that there was a step yet to be taken. So why isn't that right? So, Justice Kagan, I was trying to respond directly to your hypothetical that posited the 98% grant rate. We don't think that's actually what happened in state court. And you could look at the facts of this very case to see that. The state has sought an enforcement order from the state court for more than two years. The state court has repeatedly declined to order production. Instead, it's ordered the parties at Petition Appendix 63 to 66 to negotiate and to narrow the scope of the subpoena. I appreciate that, but it's not automatic. And maybe neither you nor I know the exact numbers. But still, I'm an ordinary person, and I think, okay, these subpoenas, they're pretty regularly issued, and maybe this one will be denied, but, you know, maybe it won't. And that's... I'm fearful of that. I don't want my name being given. So why isn't that enough? Your Honor, I think this court has always said... I mean, I guess that's to say it's even... You know, that the Clapper case was a little bit more so. But why does it have to be a little bit more so? Yeah, Your Honor, I think the facts here are pretty far afield of that. Smith and Wesson itself, at page 894 of that opinion, Joe Charbaman noted that there was far more for the state court to do than merely implement a predetermined outcome. You can see this in how other courts have handled subpoena processes in other states. For example, Twitter, at page 1196 of the Ninth Circuit opinion, said that enforcement is not a rubber stamp of the process. So I think the facts here are just different in kind. And my friends on the other side haven't alleged anything about success rates, for example, for subpoena enforcement. As a practical matter, I think the facts of this very case illustrate that there's not a predetermined outcome to this process. And I think from the perspective of Article III standing, this court has always said that you look at whether or not there's a contingent future action that the harm depends on. And here, there is a contingent future action that depends on it. Mr. Gorsuch, this is Kavanaugh. The ACLU's amicus brief expresses concern about what they call suppression by subpoena and censorship by intimidation. And they say, you know, just go with the common-sense framework that the court's cases have, which have said that a speaker is not obligated to wait for formal enforcement before challenging the constitutionality of state action and a subpoena seeking sensitive donor information, to pick up on Justice Kagan's common-sense point, can chill a disfavored speaker's protective associations long before it's ever enforced. I mean, you've gone to the specifics of the complaint, but the broader common sense of the situation reflecting the ACLU's brief, reflecting some of the questions, would seem to say, you know, this is just kind of obvious that there's some kind of objective chill from a subpoena on speech. So I just want to give you a chance to respond to that amicus brief. Absolutely. Absolutely, Justice Kavanaugh. We think there is certainly a difference between our position and the ACLU's position in that brief, but that difference is not as great as it might appear on its face. In particular, as we noted this morning, we think that while the issuance of a subpoena standing alone by itself isn't enough to get someone in the federal courthouse doors, you could have situations where there are other government statements or other government actions that themselves create an objective chill that might, together with the subpoena, be sufficient to establish standing. And I take it that that's really the thrust of the concern that the ACLU has, is where there's some clear factual record where the government, for example, has made statements or actions saying we're going to go after donors, we're going to publicly disclose their information, we want to target them. I think we would agree in those circumstances that they're standing. The problem is that the factual allegations just don't support that in this case. Thank you. Justice Barrett? Question about the Pandora's box again. So you were pointing out how many thousands of subpoenas get issued by state agencies all across the country. Presumably some of those are self-executing. You were saying, and you've admitted that there would be standing to bring pre-enforcement challenges if they were self-executing. Well, why haven't we seen a lot of pre-enforcement litigation if some of those subpoenas are self-executing? Your Honor, this Court has seen that exact litigation in cases like Bates and Shelton, both of which involved demands for disclosure, where there was a penalty that immediately attacked. But I guess my... I guess... I have no idea, empirically, how many states routinely issue non-self-executing as opposed to self-executing subpoenas. I guess what I'm trying to get a handle on is your argument that, whoa, this would be a Pandora's box because there are thousands and thousands of these subpoenas, and imagine how much litigation we would see. Where I'm going with this question, what I'm trying to nail down is, well, if half of those or three-fourths of those are already self-executing subpoenas, what's the big deal? Because presumably all those people have standing. So why are you so concerned? This actual premise, I think, is not accurate there. Overwhelmingly, states use non-self-executing subpoenas. Okay, thank you. That was the question. And then the other is I just want to be clear about the facts. In response to Justice Thomas, when you were describing the premise for seeking this donor information, et cetera, you were mentioning that it was a misleading website. So is what the state wanted to do with the donor names and addresses is to contact them to figure out if they thought they'd been donating to an abortion clinic as opposed to a pregnancy care center? I wouldn't frame it in exactly those terms, but I think we're looking at whether or not the donors have potentially been deceived. And I think if you look at... That would be the subject of the deception, right? I gather that you think the website might have made them think that this was an entity that provided abortion care as opposed to a pro-life entity, so that was the concern? Yeah, that's right, Your Honor. Justice Jackson? So just to pin this down finally, you named a couple of circumstances in which you thought a party might have the ability to challenge a non-self-executing subpoena from the moment of issuance. You say none of those exist here. And so is it your view that absent those, it's not ripe at the beginning, that the process goes forward in state court, and that, what, it's at the point of enforcement by the state court that the party would have standing, but then we have the preclusion problem? Is that your view? Yes, Your Honor. Okay, thank you. Thank you, counsel. Rebuttal, Ms. Hawley? Thank you, Mr. Chief Justice. So one of the questions is about self-executing and the comparison to this statute. I would urge Your Honors to look at footnote 1, the response brief, page 6. That catalogs a list of statutes that are non-self-executing. Excuse me, that's presumably what Judge Hardiman was thinking about in a Third Circuit decision. They read very differently from the state law. They do not say failure to obey means you can get contempt or loss of a business license. In addition, Your Honor, Justice Barrett, you asked about the state court proceeding and the representations of the Attorney General. I would point you to JA 50, 53, and 59. At each of those pages, the Attorney General represented that the mere failure to hand over donor names and the other documents demanded by the subpoena constitute a violation of three different state laws. That's in this case to the state court. Additionally, Your Honor, in response to Justice Scorsese's questions, I believe my friends on the other side conceded that this basically means that no non-self-executing subpoena gets into federal court. That's the very same litigation requirement imposed by the lower courts. It violates this court's decision in NIC. It means that every challenge would not only be disallowed at the opening stages, but it would also be precluded later on. The Attorney General in this case, this is at JA 143, argued preclusion the second time we were before the district court. They successfully prevented Smith & Wesson from ever having the merits of their claim determined in federal court by arguing preclusion. Again, that's inconsistent with Section 1983. It violates this court's decision in NIC, and it's contrary to this court's virtually unflagging obligation to exercise jurisdiction where it has been given. With respect to the non-self-executing nature of the subpoena, we want to make clear that even a non-self-executing subpoena can impose an objective chill. The test is whether a person of ordinary firmness, that sort of common-sense approach you were talking about, Justice Kagan, would terrify normal donors, mom-and-pop donors. If you look at the allegations in this case, some donors gave as little as $10. Those folks are going to be worried about a state attorney general, the highest law enforcement officer in the country, demanding their names, phone numbers, addresses, places of employment so that he can contact them about a donor website. And to speak about that donor website, it is at our opening brief, page 10. It is not in the least misleading. It pictures smiling faces of babies and their families. There's no question that it belongs to something like Planned Parenthood. In addition, if the attorney general is really worried about donor deception, it doesn't need to contact those donors. Instead, the objective standard applies under the Consumer Fraud Act. All the attorney general needs to do is prove a reasonable person would be deceived. He cannot possibly do that today. Thank you, counsel. The case is submitted.